KEY WEST ELECTRIC COMPANY, A CORPORATION, *Plaintiff in Error,* v. ANNIE ROBERTS, A WIDOW AND SOLE HEIR OF CLIFTON ROBERTS, A MINOR, DECEASED, *Defendant in Error.*

Opinion Filed May 19, 1921.

1.  Persons or corporations engaged in the business of transmitting electricity for use in private houses are held to a high degree of care for the safety of the public and the safety of thoughtless, inexperienced and rash children.

2.  Electric companies or persons engaged in transmitting electrical current into houses for domestic use are not insurers of the safety of children or adults and are not held to a degree of care, prudence and foresight beyond which prudent and careful persons have to exercise in such like circumstances.

3. Where a declaration in an action for damages for wrongful death of a person against an electric company engaged in the business of supplying eléctric current for domestic use, alleges that the deceased was lawfully upon the premises at the place where he received the electric shock which resulted in his death, the plaintiff cannot recover if the evidence shows that the deceased, a boy of about fourteen years of age, was unlawfully at the place where he received such electric shock, and where his presence could not have been anticipated by the exerçise oń the part of the company's officers of due care, prudence and foresight.

A Writ of Error to the Circuit Court for Monroe County; H. Pierre Branning, Judge.

Judgment reversed.

*W. Hunt Harris* and *Knight, Thompson & Turner,* for Plaintiff in Error;

*Arthur Gomez* and *L. A. Harris,* for Defendant in Error.

ELLIS, J.—To a judgment against the plaintiff in error in the Circuit Court for Monroe County in favor of Annie Roberts for damages for the wrongful death of her son Clifton Roberts in the sum of five thousand dollars a writ of error was taken by the Key West Electric Company, defendant in the court below.

On a corner of Division and Center Streets in the City of Key West a wooden store building consisting of two stories is located; in the rear of the building and attached to it is a shed room the roof of which is a few feet below the window sills of the second story rear window. The first floor of the building and the shed room is occu-

pied by Mr. Vegue, who conducts a grocery store there, the second story is occupied by Mr. and Mrs. Cremata, as an apartment, sister and brother-in-law to Mr. Vegue. The premises are owned by the Haskins' heirs, who through Mr. H. B. Haskins as manager rent the property to Mr. Vegue. In July, 1912, Mr. Haskins had a metal roof put on the building and shed; prior to that time the roof consisted of wooden shingles. In 1911 the defendant company engaged in furnishing electricity to consumers for light and power caused to be put up an electric light pole at the corner of the building. The pole was placed at the front end of the building and very close to it, and an electric current of one hundred and ten volts was conducted by wires into the building for lighting purposes. These wires were insulated with three braid weather proof insulation. A metal water pipe or gutter was placed under and close to the eaves for conducting the rain water to a cistern in the rear of the building; this pipe passed close to the electric wires and extended to the rear of the building and crossed the end of it a little above the shed roof. A gas pipe enters the building at the rear just above the shed roof, runs parallel to the roof for a short distance and bends downward and enters the ground near the building.

The electric wires from the pole enter the building near the front and very close to the eaves or gutter. These wires sag slightly and during a wind rub against the metal eaves or gutter. The friction thus produced wore away the insulation of both the wires for several inches.

On the 11th day of October, 1919, Clifton Roberts, the son of the plaintiff, and whose age is variously stated to have been from nine years to fourteen, went to the house on Division and Center Streets to play with the Cremata

boy, who was about his age.   Mrs. Cremata was in the
habit of giving the negro boy candy and other things to
eat when he came to visit her son.   The Roberts boy and
a little girl began to play.   The boy chased her and she
ran in the house and shut the door.   Thereupon the
Roberts boy clambered upon the roof of the shed and
tried to enter the second story window of the main build-
ing.   He was met at the window by the Cremata boy who
told him to get down.   The Roberts boy desisted from his
attempt to enter the building through the window, walked
along the roof of the shed, placed one hand upon the gut-
ter and the other upon the gas pipe and was electrocuted,
possibly, if a one hundred and ten volts low tension elec-
tric current passing through his body was sufficient to
produce his death.   Upon this point Mr. Gerbode, an elec-
trician, speaking as a witness for the plaintiff said that
an electric current of such a voltage was sufficient to kill
a person, while Mr. Montocina, commercial agent for the
defendant company and who had had several years expe-
rience as a lineman, said such a current was not danger-
ous.   And Mr. Mesa, Superintendent of "Light and Dis-
tribution" for the company, said that the boy was "killed
by coming into contact with a gas pipe and coming into
contact with a tin roof that was in contact with a wire
which must have blown into contact with the tin roof;"
yet he said that a current of 110 volts was not enough to
do any harm.

About a month before the accident a gale or hurricane
of unusual violence accompanied by heavy rain occurred
in Key West, which, according to Mr. Mesa, caused the
wires running from the electric pole to the house to sag
about six inches so that a slight breeze would cause them
to rub against the metal roof or gutter and it was the fric-

tion caused by such occasional rubbing that wore away the insulation. When there was no breeze the wires being free from the roof, and there was of course no connection and no electrical current passing steadily through the roof. If then the boy was electrocuted, a slight breeze, for the day was a calm one, must have blown the wires against the metal gutter at the moment he placed his hands upon the gutter and the gas pipe. After the accident the defendant company caused wooden brackets and insulators to be fastened to the house so as to hold the wires away from the metal gutter or roof. If those brackets had been placed there when the wires were first installed, no electric current would have passed from them through the roof. Neither before or after the storm to the date of the accident had the defendant company received any complaint from the people occupying the building that the electric service was bad. An inspection of both transformer and wires did not show that either were in bad condition. The only condition which might have attracted the company's attention was the sagging of the wires near the house, but the fact that the insulation had been worn away could not be observed from the street, because the damaged part was on the upper side of the wires.

The declaration as filed on December 1st, 1919, contained three counts. The first count alleged negligence in permitting the wires to rub against the metal roof and wear away the insulation and cause to be made a direct contact of the wires with the roof. The second count alleges the negligence of the defendant to consist in the same act of omission, and so does the third count. The last alleged that the omission of the defendant to place good and sufficient insulators or brackets on the

house resulted in the wires rubbing against the metal roof and wearing away the braid with which the wires were insulated, thus forming the contact. Each count of the declaration alleged that Clifton Roberts, who was the minor son of the plaintiff, was on the 11th day of October, 1919, "lawfully" on the shed or kitchen roof and received into his body the current of electricity which produced his death.

A motion was made to amend the declaration by requiring the plaintiff to allege what duty the defendant owed to Clifton Roberts and his mother, what act on the part of the defendant, whether of commission or omission, constituted negligence on its part, and to set out facts that would enable the court to determine whether Clifton Roberts was "lawfully" in a place where he had a right to be when the accident occurred. A demurrer was also interposed to the three counts of the declaration. The motion for amendment and the demurrer were both overruled. These orders of the court are made the bases of the twenty-first and twentieth assignments of error. The twenty-first assignment of error is not argued, so it will not be considered.

The first assignment of error is based upon the court's denial of the motion for a new trial, one of the grounds of which was that the court erred in denying the defendant's motion for a directed verdict in its behalf at the conclusion of the testimony.

Counsel for plaintiff in error express the thought that the evidence adduced by the plaintiff at the trial being weaker than the allegations of the declaration the case may be disposed of on its merits. The evidence certainly does not support the allegation that the boy Clifton

Roberts was "lawfully" on the roof of the shed at the time of the accident. In the first place, he was not upon his own premises, or that of his mother.; secondly, he had not been invited or requested to go upon the roof by any one who had any authority or control over the building; in the third place he, upon his own volition sought by that means, clambering upon the shed roof, to gain entrance into a dwelling apartment to which he had been forbidden entrance both by the children with whom he had been playing, and Mrs. Cremata, the lady of the house, who occupied the premises. The boy came that day uninvited by any one to play with the Cremata boy; they usually played in the small yard and in the street.

Occasionally Mrs. Cremata would give the boy something to eat, at which time the boy would go in the house, get what was given him and then leave. On one occasion several months, perhaps a year, before, Mrs. Cremata asked him to go out upon the roof and get a towel that had blown out there from the window.

Mr. Vegue who rented the building from the Haskins' heirs and occupied the first floor and the shed for his place of business, had not given the Roberts boy permission to go upon the roof. Upon the day of the accident, the boy was a mere trespasser upon the premises of the people occupying the house. There was neither express nor implied authority for his conduct in going upon the roof. It was not a place which attracted children as a play ground. Even as a playmate of the children he seemed to have forfeited his welcome and their hospitality. He came to the place that day without invitation and apparently in violation of his mother's instructions who had sent him to her brother's house. When he arrived at the Vegue or Cremata place, he began chasing a

little girl who ran into the house and shut the door; his playmate Vincent Cremata was in the house and "up stairs" and did not know that the boy was in the yard with the little girl. Being unable to effect an entrance through the door which had been shut to prevent his entering he sought to effect an entrance by clambering upon the roof of the shed and going through a rear window. There he was met by his playmate of other days and forbidden to enter. Retreating from the window he walked along the valley of the shed roof and placing his hands upon the gutter and gas pipe received the electric shock.

Under these circumstances what was the measure of the defendant's duty toward the boy, or any one in his situation? The accident occurred in the day time about 12:30 P. M. But whether in the day time or the night time he was none the less a trespasser. Assuming that the company, the defendant below, was guilty of negligence in not putting brackets and insulators on the house upon which to carry the wires through which the current was transmitted for lights, after the roof had been changed from a wooden roof to a metal one, or in not observing that the friction of the slack wires upon the metal eaves or gutter had worn away the insulation so that during a breeze the wires would be blown occasionally against the edge of the roof and momentarily make a connection through which the electric current might pass to the roof and thence to the ground through the body of a person who might be unlawfully upon the shed roof at the moment that a gust of wind carried the wires against the eaves of the roof or gutter and at the same moment touch a gas pipe which entered the ground, can it be said as a matter of law that the company was bound to exercise the same degree of care to prevent injury to such a person

VOL. 81, JANUARY TERM, 1921.          751

Key West Elec. Co. v. Roberts—Opinion of Court.

as it would be bound to exercise toward persons who had a right to be on the roof? That such a person's presence under such circumstances was a condition that the company might reasonably anticipate? The defendant's omission of duty, if there was any such omission upon its part, seems to have consisted in failing to keep its wires at the point where they entered the house properly insulated. They were properly insulated when placed there, and were of no danger whatsoever to any person occupying the premises, but changing the roof from a wooden one to a metal one which was done not by the defendant, but by the owners of the property, introduced another condition, but not necessarily a dangerous one, as the occasional contact between the wires and the roof was not shown to be dangerous to any person who might reasonably be expected to be upon the premises. The doctrine is applied by the courts with substantial unanimity that while the business of transmitting electricity is so necessary to the comfort and convenience of society, yet the persons engaged in such business must be held to a high degree of care for the safety of the public and the thoughtlessness and inexperience and rashness of children. See Jacksonville Electric Co. v. Sloan, 52 Fla. 257, 42 South. Rep. 516. But notwithstanding such duty persons engaged in such business are not insurers of the safety of children more than others, and are not held to a degree of care, prudence and foresight beyond which prudent and careful persons have to exercise in such like circumstances. See Curtis Law of Electricity, 687-777.; Wetherby v. Twin State Gas & Electric Co., 83 Vt. 189, 75 Atl. Rep. 8, 25 L. R. A. (N. S.) 1220; Trout v. Philadelphia Electric Co., 236 Pa. 506, 84 Atl. Rep. 967, 42 L. R. A. (N. S.) 713; Keefe v. Narragansett Electric Lighting Co., 21 R. I. 575, 43 Atl. Rep. 542; Sullivan v. Boston & Albany R. Co., 156

Mass. 378, 31 N. E. Rep. 128; Cumberland v. Lottig, 95 Md. 42, 51 Atl. Rep. 841; Burnett v. Ft. Worth Light & Power Co., 102 Texas 31, 112 S. W .Rep. 1040, 19 L. R. A. (N. S.) 504; Winegarner v. Edison Light & Power Co., 83 Kan. 67, 109 Pac. Rep. 778; Heller v. New York, N. H. & H. R. Co., 265 Fed. Rep. 192; City of Greenville v. Pitts, 102 Tex. 1, 107 S. W. Rep. 50, 14 L. R. A. (N. S.) 979; Cumberland Telegraph & Telephone Co. v. Martin's Adm'r., 116 Ky. 554, 76 S. W. Rep. 394; 77 S. W. Rep. 718; McCaughna v. Owosso & Corunna Electric Co., 129 Mich. 407, 89 N. W. Rep. 73; Hector v. Boston Electric Light Co., 161 Mass. 558, 37 N. E. Rep. 773; Augusta Ry. Co. v. Andrews, 89 Ga. 653, 16 S. E. Rep. 203.

There was no actionable negligence on the part of the company toward the boy because the company under the circumstances did not owe to the boy, or any one situated as he was at the time of the accident, that high degree of care which would have required the company to have discovered the worn insulation and occasional contact of the wires with the roof.

There is also another reason why the judgment should be reversed, and that is because of the variance between the allegation and the proof as to the boy's being lawfully at the place where the accident occurred.

It is unnecessary to discuss the other assignments of error.

The judgment is reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.

WHITFIELD, J., concurring.

It does not appear that the electric company should reasonably have anticipated an injury of the nature here disclosed, or that the plaintiff below has a cause of action in view of the circumstances under which the decedent was fatally injured.

Even if the electric company should have known that the insulation on the wire had been impaired by rubbing against the eaves or gutter of the metal roof when the wind would blow the wire towards the roof, so that the electric current would pass along the metal roof to the metal pipes touched by the decedent, the electric company should not in reason be required to anticipate that any one would be upon the roof under the circumstances shown in this case. See principles discussed in 213 U. S. 1. The burden was on the plaintiff to show a breach of duty to the decedent that proximately caused the death. See 20 C. J. 380.

In Temple v. McComb City Electric Light & Power Co., 89 Miss. 1, 42 South. Rep. 874, 10 Ann. Cas. 924, it appeared that the defendant electric company "had negligently removed the insulation from its wires at a place where said wires passed through a tree which had numerous branches extending almost to the ground, and in which plaintiff and other children played." A cause of action was stated. 20 C. J. 353.

In Benton v. North Carolina Public Service Company, 165 N. C. 354, 81 S. E. Rep. 448, the long continued dangerous condition of the wires in the tree with attractions to boys should have been known to the defendant company. Recovery was allowed. See also Mullen v. Wilkes-Barre G. & E. Co., 229 Pa. 54, 77 Atl. Rep. 1108; Daltry v. Media Electric Light, Heat & Power Co., 208 Pa. 443,

57 Atl. Rep. 833; Consolidated Electric Light & Power Co. v. Healey, 65 Kan. 798, 70 Pac. Rep. 884; Nelson v. Branford Lighting & Water Co., 75 Conn. 548, 54 Atl. Rep. 303, where actionable negligence was shown. In Elias v. Mayor & Board of Trustees of City of New Iberia, 137 La. 691, 69 South. Rep. 141, the wires were obviously strung so low as to endanger the ordinary use of a wire clothes line on the premises. A recovery was proper.

In Clements v. Louisiana Electric Light Co., 44 La. Ann. 692, 11 South. Rep. 51, 16 L. R. A. 43, the decedent was properly on the roof where the wires were improperly placed, and not properly insulated. No contributory negligence appeared and damages were recovered. See also 46 L. R. A. 745; 34 L. R. A. 812; 164 Mass. 492.

Elements essential to liability were not shown in this case. See 61 Fla. 293; 63 L. R. A. 469; 52 L. R. A. (N. S.) 1170; 49 South. Rep. 772; 20 C. J. 351; 9 R. C. L. 1209; 115 Me. 361; 165 N. Y. Supp. 852; 89 Conn. 286; 166 Fed. 651.